IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BANK OF AMERICA, N.A., *et al*., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:10-cv-00975-CSC |
| | ) | |
| THOMAS E. NEWTON, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| BANK OF AMERICA, N.A., *et al*., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:10-cv-00976-CSC |
| | ) | |
| NEWTON OLDACRE | ) | |
| MCDONALD, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## JOINT ORDER ON PRETRIAL HEARING

A pretrial conference was held in the above case on May 15, 2012, wherein, or as a result of which, the following proceedings were held and actions taken:

      1.    <u>PARTIES AND TRIAL COUNSEL:</u>

<u>Parties:</u>                                        <u>Trial Counsel</u>

<u>Plaintiff:</u>    U.S.    Bank    National      W. Patton Hahn and Paige J. Casey
Association, as Trustee, successor in
interest to Bank of America, National

Association, successor by merger to LaSalle Bank National Association for the registered holders of GE Capital Commercial Mortgage Corporation, Commercial Mortgage Pass-Through Certificates, Series 2001-1 ("Plaintiff") acting by and through C-III Asset Management LLC, solely in its capacity as Special Servicer

Defendant(s): Newton, Oldacre, McDonald, LLC ("NOM"), Thomas E. Newton, Mark McDonald, and William Oldacre (the "Joinder Parties")

John P. Scott, Jr., George E. Newton, and Bryan G. Hale

## COUNSEL APPEARING AT PRETRIAL HEARING:

For the Plaintiff:  W. Patton Hahn and Paige J. Casey of Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.

For the Defendants:  John P. Scott, Jr., and Bryan G. Hale of Starnes Davis Florie, LLP

2.   JURISDICTION AND VENUE:

a.   The court has subject matter jurisdiction of this action under the following statutes, rules or cases:   28 U.S.C. § 1332(a).

b.   All jurisdictional and procedural requirements prerequisite to maintaining this action have been met.

c.   Venue is proper in this judicial district pursuant to 28 § U.S.C. 1391(a).  Personal jurisdiction and venue are not being contested.

3.   <u>PLEADINGS</u>:   The following pleadings have been allowed:

Complaint, Defendants' Answers to the Complaint, Defendant Newton, Oldacre, McDonald, LLC's Counterclaim, Plaintiff's Answer to the Counterclaim.

4.   <u>CLAIMS AND DEFENSES OF THE PARTIES</u>:

(a)   <u>Plaintiff's Claims:</u>

(i)   <u>Breach of Contract against all Defendants</u>

Four single purpose entities (NOM Bessemer, LTD., NOM Clarksville OD, LTD., 98 Palms Center, LTD., and NOM Pascagoula OD, LTD. (collectively, the "Borrowers")) entered into Loan Agreements and Notes now held by the Plaintiff. NOM executed an Acknowledgment of Property Manager, now held by Plaintiff, for each property (collectively, the "Acknowledgments"), wherein NOM agreed to subordinate any rights to payment under its Property Management Agreements with the Borrowers (the "PMAs") to Plaintiff's Liens in the Collateral.   Pursuant to the Acknowledgments, and upon written notice that an event of default has occurred under the Notes and that a Borrower's license to collect the Property Proceeds has been revoked, NOM agreed not to pay any of the funds which are Collateral to the Borrower without the prior written approval of Plaintiff and to pay the same as instructed by Plaintiff.

The Joinder Parties each executed a Joinder for each Loan Agreement, which are now held by Plaintiff, in which the Joinder Parties jointly and severally

guaranteed the performance by Borrowers of all obligations and liabilities for which Borrowers are personally liable under Section 12.1 of the Loan Agreements, including misapplication of the rents, the failure to apply the rents as directed by the Loan Agreements, and interference with Plaintiff's rights to the rents.

Borrowers defaulted on their loan obligations in August 2009 when NOM, the Property Manager of the Borrowers (whose principals are nearly identical to the owners of the Borrowers), failed to make payments of principal and interest on their behalf to Plaintiff.   NOM received notice, pursuant to Section 5 of the Acknowledgments that Borrowers were in default under the Notes by four letters each dated October 22, 2009.  NOM further received notice, pursuant to Section 5 of the Acknowledgments, that an event of default had occurred under the Notes and, as a result of such events of default, Holder had revoked Borrowers' license to collect the Property Proceeds by four letters each dated November 20, 2009.  The November 20, 2009 letters also demanded that NOM pay all income collected from the Borrowers over to Plaintiff.

The default was intentional as NOM and the Joinder Parties caused Borrowers to withhold debt service so that NOM could be repaid for alleged advances NOM had made the Borrowers over the life of the loan.  Instead of holding the rents NOM collected in trust for Plaintiff (as NOM had promised to do), NOM caused the Borrowers to pay NOM at least $1,584,628 in rents and fees

generated by and collected from the properties (i.e., from Plaintiff's collateral), which constituted a misappropriation of the rents, a failure to apply the rents as directed by the Loan Agreements, interference with Plaintiff's rights to the rents, and a breach of the Acknowledgments.

At least $1,584,628 in rents and fees were misappropriated when the Borrowers and the Borrower Parties (the Joinder Parties) paid NOM these fees post-default after Plaintiff directed the funds to be paid to it. Accordingly, the Joinder Parties are liable for such amounts, and their failure to pay these funds to Plaintiff constitutes a breach of the Joinder Agreements. Moreover, NOM's failure to pay the monies it received post-default to Plaintiff constitutes a deliberate breach of the Acknowledgments executed by the Defendants, respectively, in favor of Plaintiff. Plaintiff is entitled to these monies under its contracts with the Defendants.

(ii)    <u>Fraudulent Conveyance against NOM</u>

NOM fraudulently conveyed the funds at issue in this case to itself with full knowledge of Plaintiff's liens under the Loan Documents, its own subordination to those liens pursuant to the Acknowledgments, and the revocation of Borrowers' ability to collect the Property Proceeds, when it transferred at least $1,584,628 in rents and fees collected from the Properties to itself. Indeed, NOM freely admits

that not paying Plaintiff was the only way that it could recover funds advanced to the Borrowers.

(iii)   <u>Breach of Fiduciary Duty against NOM</u>

In the plain text of the Acknowledgments, NOM admits its status as a fiduciary; any rents or other income it collected or received from the properties were to be "held in trust for the benefit of Borrower[s] and [Holder]."  Moreover, NOM knew of Borrowers' default under the Loan Documents because NOM was the entity that failed to make the debt service payments on Borrowers' behalf and NOM received the Notices of Default, which revoked Borrowers' ability to collect the Property Proceeds.  However, NOM ignored its fiduciary duty to Plaintiff, ignored its (and Borrowers') contractual obligations to Plaintiff, ignored Plaintiff's directives, and ignored its own subordination to Plaintiff's liens by causing Borrowers to divert to NOM monies that should have been paid to Plaintiff – and that NOM had promised to pay over to Plaintiff.  NOM breached its fiduciary duty by intentionally and fraudulently diverting the monies it collected for the Borrowers and held in trust for the Plaintiff, thereby depriving Plaintiff of at least $1,584,628.

(iv)    The Plaintiff's Damages

*Compensatory*:

The Plaintiff was damaged in the amount of the monies NOM caused the Borrowers to transfer to NOM post-default (withholding debt service) that should have been paid to Plaintiff, as follows:

| Dates | Amounts | Evidentiary Record |
|-------|---------|-------------------|
| August-September 2009 | $246,000 | Ex. 62 to Doc. 51-1, Colson Dep. |
| October 2009-July 2010 | $1,241,700 | Ex. 51 to Doc. 51-1, Colson Dep. |
| August 2010 | $96,928 | Exs. 70-71, 73-74 to Doc. 51-1, Colson Dep. |
| **Total** | **$1,584,628** | |

As a result of its decision to withhold debt service from the Plaintiff, implemented from August 2009 through August 2010, NOM repaid $1,584,628 of the advances it had allegedly made to the Borrowers.  Had NOM honored its contract with Plaintiff, not breached its fiduciary duty, and not fraudulently transferred these monies to itself from Borrowers, then Plaintiff would have received these monies.  These monies constitute Plaintiff's compensatory damages in this action.

*Punitive:*

Plaintiff seeks an award of punitive damages against NOM as a result of its breach of fiduciary duty and fraudulent conduct in an amount for the Court to determine.

> (v)   <u>Relevant legal authority supporting Plaintiff's claim(s) and damages</u>

1.   Plaintiff has alleged and intends to prove a *prima facie* breach of contract case against Defendants.  *See Reynolds Metals Co. v. Hill,* 825 So. 2d 100, 105 (Ala. 2002) ("The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.").

2.   Alabama courts interpret contracts by giving contract terms their ordinary, plain, and natural meaning.  *Shoney's, LLC v. MAC East, LLC*, 2009 WL 2343674 *5 (Ala. 2009).

3.   Expert testimony that is not relevant is inadmissible. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993).

4.   The Plaintiff is entitled to consequential damages.  "The law generally allows for the recovery of all damages, including incidental and consequential, caused by the breach of contract or the commission of a tort." *Van Hoof v. Van Hoof,* 997 So. 2d 278, 298 (Ala. 2007) (citing *Ex parte Steadman,* 812

So. 2d 290, 295 (Ala. 2001) ("The general rule as to the measure of damages in breach of contract cases is that damages are recoverable which are the natural and proximate consequence of the breach, and it is that sum which would place the injured party in the same condition he would have occupied if the contract had not been breached.").

     5.    The three elements necessary before a conveyance will be declared fraudulent are: "(1) a creditor to be defrauded; (2) a debtor intending to defraud; and (3) a conveyance of property out of which the creditor could have realized his claim or some portion thereof." *Champion v. Locklear,* 523 So. 2d 336, 338 (Ala. 1988) (citations omitted).

     6.    "[W]ithout regard to actual intent, the law will find a constructive fraud when a grantor, indebted at the time, conveys property without receiving valuable consideration." *Champion*, 523 So. 2d at 338.

     7.    A party who agrees to hold funds "in trust" for another is a fiduciary. *See Edwards v. Allied Home Mortgage Capital Corp.*, 962 So. 2d 194, 206 (Ala. 1997) (employee who agreed to hold monies "in trust" for employer held to be a fiduciary); *Festorazzi v. First Nat. Bank of Mobile*, 264 So. 2d 496, 507 (Ala. 1972) ("[T]he ordinary sense of the term ['in trust'] is descriptive of a fiduciary estate or technical trust . . . ." (quoting *King v. Mitchell*, 33 U.S. 326 (1833))).

8.      The Plaintiff is entitled to an award of punitive damages against NOM as a result of its breach of fiduciary duty and fraudulent conduct. *See Systrends, Inc. v. Group 8760, LLC*, 959 So. 2d 1052 (Ala. 2006) (recognizing that punitive damages may be awarded for a breach of a fiduciary duty); *Sheffield v. Andrews*, 679 So. 2d 1052, 1053 (Ala. 1996) (allowing punitive damages in a fraudulent conveyance action stating, "Courts award exemplary damages to discourage oppression, fraud, or malice by punishing the wrongdoer . . . .  Such damages are appropriate in cases . . . where restitution would have little or no deterrent effect, for wrongdoers would run no risk of liability to their victims beyond that of returning what they wrongfully obtained . . . .  Punitive damages are for punishment and prevention . . . .") (quoting *Mid-State Homes, Inc. v. Johnson*, 311 So. 2d 312, 318 (Ala. 1975)) (further citations omitted).

9.      The elements of a breach of fiduciary claim are that (1) defendant owed plaintiff a fiduciary duty; (2) that defendant breached that duty; and (3) defendant's breach of that duty was the cause of the alleged damages. *Citizens Nat. Bank of Shawmut*, 570 So. 2d 635, 638 (Ala. 1990) (assessing elements plaintiff had to prove in establishing breach of fiduciary duty claim).

    (b)    <u>Defendants' Defenses:</u>

        (i)    <u>Defendants' Defenses to Count I: Breach of Contract</u>

In February 2001, the Borrowers borrowed funds from General Electric Capital Corporation under Loan Agreements and Notes now held by Plaintiff. The loans were non-recourse and only specific conduct could trigger the Borrowers' personal liability. This conduct is set forth in section 12.1 of the Loan Agreement and includes: the Borrower or Borrower Party's misapplication of any funds derived from the Project in violation of this Agreement or any other Loan Document; Borrowers' failure to apply proceeds or rents to the costs of maintenance and operation of the project, Debt Service, and other amounts due under the Loan Documents; and the Borrowers' interference with Lender's exercise of rights under the Assignment of Leases and Rents.

The individual defendants, Messrs. Newton, Oldacre, and McDonald, signed Joinder Agreements in which they guaranteed the Borrowers' obligations and limited liabilities. Plaintiff contends that these individuals breached the terms of those Joinder Agreements. But their liability arises only if the Borrower is personally liable to the Lender. Because the Borrowers did not engage in any of the conduct prohibited by section 12.1 of the Loan Agreements, the individual defendants did not breach their Joinder Agreements.

NOM, as the property manager for each of the Borrowers, signed only one agreement for the Lender in connection with each of these loans, the Acknowledgment of Property Managers.   NOM also entered into a Property Management Agreement with each Borrower which is referenced in, and attached to, the Acknowledgments and was approved by the Lender, whose interest is now held by the Plaintiff.

Prior to the origination of the Borrowers' loans, NOM advanced significant sums to the Borrowers to develop and operate the properties. With knowledge of these loans by NOM, the Lender funded the loans to the Borrowers.  As required by the Loan Documents, the Borrower regularly provided detailed financial statements disclosing the loans which NOM made to the Borrowers and the Borrowers' periodic repayments of those loans to NOM.   In 2009, NOM transferred funds from the Borrowers' accounts to repay the loans NOM made to the Borrowers.

NOM did not breach the Acknowledgments because those agreements, along with the Property Management Agreements attached to them, and the other Loan Documents provide authority for repayment of the loans NOM made to the Borrowers.

First, the Property Management Agreements provide that NOM may advance funds to the Borrowers and any "such advance shall be considered a loan

subject to repayment with interest, and [Borrower] hereby agrees to reimburse [NOM]. . . and hereby authorizes [NOM] to deduct such amounts from any monies due [Borrower]." Furthermore, the Loan Agreements define Debt Service as "the aggregate interest, fixed principal, and other payments due under the Loan, and on any other outstanding permitted Debt relating to the Project approved by Lender for the period of time for which calculated."  Further still, the Mortgages permit the Borrowers' repayments to NOM when they define "Indebtedness" as "[t]he sum of all principal, interest and other amounts due under or secured by the Loan Documents."  All of these documents support the right of NOM to be repaid for the loans made to the Borrowers.

Moreover, the advancement of funds by NOM to the Borrowers occurred over the entire history of the Loans and it would be inequitable to allow Plaintiff to alter the parties' course of dealing now.  These loans and their repayment from time to time were repeatedly disclosed to the Lender in a To/From entry on financial reports for years.  The Borrowers would have defaulted on their payment on the Loans made in 2001 years before without NOM's advanced funds.  Accordingly, NOM has not breached any agreement with Plaintiff.

Finally, and alternatively, if the Plaintiff's interpretation of the obligations of NOM under the Acknowledgments and other Loan Documents is correct, the damages which the Plaintiff claims are incorrect.  The Acknowledgments allow

NOM to receive payments until NOM receives notice from the Lender as required by the Acknowledgments.

Plaintiff has alleged in Paragraph 33 of the Complaint that it provided the notice required by the Acknowledgments to NOM in May 2010. Any retreat from the allegations of the Complaint now is self-serving and is contradicted by the terms of the letters upon which it has relied. The October and November 2009 letters fail to provide, or even reference, the notice to NOM required under the Acknowledgment. Therefore, even if Plaintiff is entitled to the return of funds paid to NOM following the required notice, those funds are limited to $128,800.

      (ii)    <u>Newton Oldacre McDonald, LLC's Defenses to Count II:
Fraudulent Transfer</u>

Not every transfer that frustrates a creditor is a fraudulent transfer. *See Aucoin v. Aucoin*, 727 So. 2d 824 (Ala. Civ. App. 1998); *In re Earle*, 307 B.R. 276, 296 (S.D. Ala. Bankr. 2002). NOM is entitled to judgment in its favor on Plaintiff's fraudulent transfer claim because NOM provided reasonable equivalent value for the transfers over the history of the loans. *See* Ala. Code § 8-9A-3. The documents provided periodically to the Lender disclosed the amount of the loans by NOM and the repayments of those loans. Furthermore, the transfers were not only for reasonable and equivalent value, the transfers were the Borrowers' lifeline. The Borrowers would have defaulted in their loan payments to Lender

years before had NOM not advanced funds to the Borrowers for operational costs and debt service.

Moreover, the evidence in this case falls short of that required under Alabama law for a showing of either intentional or constructive fraud. See Ala. Code (1975) 8-9A-1, *et seq.*   It is undisputed that NOM made loans to the Borrowers and the Borrowers repaid NOM for those advances over the history of the loans, all of which were disclosed to the Lender.  Where there is a supervening legitimate purpose for the alleged fraudulent transfer, there can be no actual intent to defraud any creditor. *See In re Earle*, 307 B.R. at 296 (citing *Max Sugarman Funeral Home v. A.D.B. Investors*, 926 F.2d 1248, 1254-55 (1st Cir. 1991) and noting the Eleventh Circuit's citation to that decision with approval in *In re XYZ Options*, 154 F.3d 1262, 1271 n.17 (11th Cir. 1998)).

The funds advanced by NOM were critical to the Borrowers' operation and necessary for the Borrowers' survival. When NOM was repaid, it was, at least in part, for debts that predated the Borrowers' loans from the Lender. Because the alleged fraudulent transfers were made for valuable consideration, the transfers were bona fide, and thus constructive fraud cannot be proven.

          (iii)    Newton Oldacre McDonald, LLC's Defenses to Count III: Breach of Fiduciary Duty

NOM is not liable for any alleged breach of fiduciary duty under the Acknowledgments because NOM owed, and fulfilled, its duties to the Plaintiff and

the Borrowers. The Loan Documents—including the Acknowledgments, the Property Management Agreements, and the Loan Agreements—authorized NOM to use the proceeds generated by the properties in payment of the Borrowers' expenses. The Acknowledgments specifically provide that NOM was entitled to assume that the Notes were being paid until notified by the Lender otherwise. Whether NOM had reason to know of the Borrowers' default is immaterial. The Plaintiff had to notify NOM pursuant to the Acknowledgments and it did not do so until May 2010. Even after the proper notice, NOM satisfied the duties it owed to the Borrowers and the Plaintiff.

Though Plaintiff argues to the contrary, the Acknowledgments do not place one beneficiaries' rights or interests over another. NOM paid the Borrowers' legitimate debts, including the debts the Borrowers owed to NOM and disclosed to the Plaintiff. The Loan Documents provide for those loan repayments to NOM and no fiduciary obligations were breached.

          (iv)    <u>Plaintiff is not entitled to the claimed compensatory damages, punitive damages, or attorneys' fees</u>

Plaintiff seeks to recover all funds that NOM received from the Borrowers from August 2009 through foreclosure in September 2010. Though NOM disputes that it is liable for any damages, Plaintiff's calculations miss the mark and are inconsistent with the Acknowledgments and other Loan Documents. The amount that NOM received is not the true measure of damages even under Plaintiff's

theories of liability.  The accurate measure is the amount of rent that the Borrowers received following proper notice to NOM, minus the expenses NOM paid in operating the properties.  As mentioned above, even under Plaintiff's argument, NOM was entitled to payments due under the Property Management Agreement— including the repayments of the Borrowers' loans—until notified pursuant to the Acknowledgments.  According to the Complaint, the date of that notice was May 2010.

Using the May 2010 date as alleged in the pleadings, the tenants paid $496,504 in rent to the Borrowers. After the Borrowers paid $227,610 for the operational expenses of the properties, $17,973 in  management fees due to NOM, and $72,121 in debt service to the Plaintiff, the maximum amount of funds that NOM could have "misapplied" is $128,800—not $1,489,718.95 as alleged in the Complaint or $1584,628 as alleged above.

Courts award exemplary damages and attorneys' fees to discourage oppression, fraud, bad faith, or malice by punishing the wrongdoer.[1]  NOM's loan repayments, however, do not justify the imposition of these damages or fees for two important reasons.

First, the Loan Documents permitted NOM to loan money to the Borrowers and for NOM to be repaid. Even if NOM were found to be incorrect in its belief

---

[1] [Doc. 52], p. 24-25 (citations omitted).

17

that those payments were authorized, its conduct was not oppressive, fraudulent, wanton, or malicious such that punitive damages should be awarded. *See* ALA. CODE (1975) § 6-11-20.

Second, the testimony of NOM's corporate representative establishes that NOM's decision to direct the repayments by the Borrowers was also based on the advice of counsel. Where a party's actions are based on the good faith reliance on the advice of counsel, that reliance demonstrates the lack of fraudulent or malicious intent. *Cf. U. S. v. Stevens*, 771 F. Supp. 2d 556, 560 (Md. 2011) (noting that good faith reliance on the advice of counsel is only relevant to specific intent crimes because such reliance demonstrates a defendant's lack of the requisite intent to violate the law).

    (c)    <u>Defendant's Counterclaims:</u>

    (i)    <u>NOM's Breach of Contract Counterclaim</u>

NOM's counterclaim alleging breach of contract is simple: NOM agreed to provide management services and the Borrower and Plaintiff agreed that NOM should be paid for those services. After the Borrowers' default, the Plaintiff reversed course and unilaterally decided that NOM should not be paid for its continuing management of the Borrowers' properties.  That decision is inconsistent with the terms of the Acknowledgments.  As set forth above, a breach of contract action requires proof of (1) a valid contract binding the parties; (2) the plaintiff's

performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.

The Acknowledgments provide that, if the Borrower stops paying NOM for its management services, NOM shall continue to perform under the Property Management Agreements, subject to being paid pursuant to such Agreements for the work performed.  The Borrowers stopped paying NOM after the Plaintiff's July 2010 request to the tenants that they begin sending rent checks directly to the Plaintiff, as requested.  The Plaintiff exercised control over those funds, benefitted from NOM's management services, and owes NOM for its management services. After the Plaintiff began receiving rents from the tenants, NOM attempted to resign, but Plaintiff requested that NOM continue to manage the properties until October 2010.

There is no dispute that Plaintiff did not pay NOM for the management services it rendered during that time. Plaintiff has admitted that it did not pay NOM for those services and had no intention of paying NOM for those services.

The Acknowledgments also support NOM's recovery of the amounts it advanced to the Borrowers.  In the event that the Plaintiff foreclosed on the Borrowers' properties, it agreed to pay NOM amounts the Borrower owed NOM from the time of the Borrowers' default under the Property Management Agreement to the foreclosure sale. The Loan Documents, which include the

Property Management Agreement, recognize that NOM could loan money to the Borrowers and that it would be repaid.

The NOM loans permitted the Borrowers to avoid default in payments for Plaintiff's loans thereby allowing the Plaintiff to recover over six million dollars that it would not have received otherwise. Though the Borrowers repaid some of those borrowed funds, they did not repay them all. The unpaid loans totaling $180,000 are due from the Borrowers under the Property Management Agreement, and in the Acknowledgment, the Plaintiff agreed to pay those amounts. They have not paid NOM anything and should be ordered to do so.

(ii)    <u>NOM's Equitable Counterclaims</u>

To reward Plaintiff for its knowing and intentional use of NOM's services without payment unjustly enriches Plaintiff. To prevail on this Counterclaim, NOM must prove that (1) the Plaintiff knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation. *Matador Holdings, Inc. v. HoPo Realty Investments, LLC*, 77 So. 3d 139, 145 (Ala. 2011). NOM will prove each of these elements.

Plaintiff has admitted in testimony that it intended for NOM to continue to manage the properties after it requested that the tenants pay the Plaintiff directly and that it had no intention of paying NOM for its services. Plaintiff also admitted that it had the Borrowers' financial reports available to it, even before the

Borrowers' default, but never looked at them.  Such reports disclosed the funds advanced by NOM to the Borrowers, as well as repayments made by the Borrowers.

NOM had a reasonable expectation that it would be paid for its management services.  And based on the language of the Loan Documents discussed above, NOM has a reasonable expectation that it would be repaid the amounts it loaned to the Borrowers.

(d)    <u>Plaintiff's Defenses to Counterclaims:</u>

Notably, Defendant NOM conceded that its claims for Conversion and Intentional Interference with its Contractual Relationship with Borrowers are due to be dismissed.  (Doc. 54 at p. 28).  NOM's only remaining counterclaims against Plaintiff are for breach of contract, or in the alternative, quantum meruit/unjust enrichment.

(i)    <u>Plaintiff's Defenses to NOM's Breach of Contract<br>Counterclaim</u>

NOM's breach of contract claim seeks payment from Plaintiff for its alleged management services after Plaintiff directed the tenants to pay their rents directly to C-III.  Notably, NOM seeks to collect management fees allegedly owed by the Borrowers (not the Plaintiff) under the PMAs.  The Acknowledgments provide a strict protocol to be followed before the Lender is responsible for any management fees.  That protocol was not followed by NOM.

21

The Acknowledgments state that upon the default of the Borrowers under the PMAs, NOM would notify the Plaintiff.  There is no evidence that NOM provided Plaintiff with any such notification of Borrowers' default under the PMAs.  Moreover, the Acknowledgments state that upon the Plaintiff's request, NOM would continue to perform under the PMAs subject to being paid for the work performed.  It is undisputed that NOM resigned as Property Manager on August 25, 2010; it is also undisputed that such a prompt resignation violated the Acknowledgment provisions that required a 30 day notice, and Plaintiff merely objected to the resignation on that ground.  The Plaintiff did not request that NOM continue as Property Manager, and as Sam Colson's (NOM's corporate representative) testimony shows, NOM agreed to assist with the transition.

Moreover, NOM is not due management fees because it did not provide management services.  Mr. Colson explained that after the tenants were directed to pay C-III instead of NOM, NOM could not (and did not) perform its management duties because it could not collect rents or pay expenses as it no longer had access to the Property Proceeds.  *See* Doc. 51-3, Colson Dep., 112:17-114:7.  Instead, NOM merely assisted in the transition of the Properties into foreclosure.  *See id*. at 114:1-5 (stating that NOM told Plaintiff that it "will continue to work and do whatever is necessary to help transition with whatever documents are needed, whatever, keys, everything, you know. And we did that.").

Finally, NOM attempts to hold Plaintiff responsible for monies the Borrowers owed NOM for alleged advances. However, the Acknowledgments preclude this exact scenario by providing that "[Plaintiff] has not assumed any obligations of Borrower to Property Manager under the [PMAs]." Furthermore, there is no agreement, express or implied, and there is no legal basis, upon which to hold Plaintiff responsible for any amounts Borrowers may have owed NOM. Finally, it is clear under the Acknowledgments that any amounts owed by the Borrowers to NOM were subordinated to amounts the Borrowers owed Plaintiff.

(ii) <u>Plaintiff's Defenses to NOM's Equitable Counterclaims</u>

Plaintiff's defenses to NOM's breach of contract claim equally apply here. In addition, NOM cannot satisfy the elements of unjust enrichment because it had no reasonable expectation of compensation for its alleged management services: as set forth above, it did not follow the protocol set out by the Acknowledgments for repayment of management services; it did not continue to perform the management services as it did not have access to the Property Proceeds; and it knew that its right to repayment from Borrowers was subordinated to Plaintiff's right to repayment from Borrowers.

Indeed, NOM expressly admits that it never expected repayment of any management fees. Mr. Colson, NOM's designated corporate representative,

23

testified that NOM resigned as Property Manager because "[t]here was no way for it to be compensated for its work." *See* Doc. 51-3, Colson Dep., at 112:17-114:7.

Accordingly, NOM's claims against Plaintiff seeking payment of management services and to recover additional funds given to Borrowers fail under the express terms of the Acknowledgments.

5.    <u>STIPULATIONS OF FACT BY AND BETWEEN THE PARTIES:</u>

**The Loan Documents**

1.    The Borrowers each entered into a loan agreement (collectively, the "Loan Agreements") with General Electric Capital Corporation (the "Original Lender").

2.    Each Loan Agreement was evidenced by a note (collectively, the "Notes") executed by each Borrower for its respective loan.

3.    The Notes were each secured by, among other things, a mortgage and an assignment of rents executed by each Borrower for the benefit of Original Lender (collectively, the "Liens") encumbering the assets described therein (collectively, the "Collateral").

4.    At the Original Lender's request, NOM executed an Acknowledgment of Property Manager for each property (collectively, the "Acknowledgments").

5.      Attached as an Exhibit to each of the Acknowledgments was the Property Management Agreement (the "PMAs") between NOM and each Borrower setting forth the terms of NOM's management of the Borrowers' properties.

6.      In the Acknowledgments, NOM agreed that all payment obligations of the Borrower to the Property Manager for services rendered for the management and operation of the Property as such services are described in the Property Management Agreement are subordinated to Plaintiff's right to receive payments from the Borrower under the Note and all other amounts which may be due Plaintiff under the Loan Documents.

7.      In Recital D the Acknowledgments state, "[NOM] has agreed to subordinate any rights to payment under the [PMAs] to [Plaintiff's] liens more particularly described in the Mortgage and Loan Documents (as that term is defined in the Loan Agreement)."

8.      Pursuant to the Acknowledgments, NOM agreed "that any and all rents, profits or other sums . . . collected or received by [NOM] from the Propert[ies] are subject to a security interest of [Plaintiff] pursuant to the Loan Documents."   NOM also agreed that any and all rents, profits or other sums collected or received by NOM would be used for proper expenses and costs of managing and operating the Collateral as permitted under the PMAs and would be held "in trust for the benefit" of Borrowers and Original Lender.

9.     Pursuant to the Acknowledgments, and upon written notice that an event of default had occurred under the Notes and that a Borrower's license to collect the Property Proceeds has been revoked, NOM agreed (i) not to pay any of the funds which are Collateral to the Borrower without the prior written approval of Original Lender; (ii) to pay those funds in payment of the sum of all principal, interest, and other amounts due under or secured by the Loan Documents or as instructed by the Lender; and (iii) to cooperate in the establishment of a lock box if so instructed by the Original Lender.

10.     The Joinder Parties, the three individual members of NOM, each executed a Joinder for each Loan Agreement (collectively, the "Joinders") in which the Joinder Parties jointly and severally guaranteed the performance by the Borrowers of all obligations and liabilities for which Borrowers are personally liable under Section 12.1 of the Loan Agreements.

11.     Under Section 12.1, the Borrowers are personally liable to the lender for any deficiency, loss, or damage suffered by Lender because of:

> (c)   the misapplication by Borrower or any Borrower Party of any funds derived from the Project . . .in violation of this Agreement or any of the other Loan Documents . . . .
>
> ****
>
> (f)   Borrower's failure to apply proceeds of rents or any other payments in respect of the leases and other income of the Project or any other collateral when

26

received to the costs of maintenance and operation of the Project and to the payment of taxes, lien claims, insurance premiums, Debt Service, the Funds, and other amounts due under the Loan Documents to the extent the Loan Documents require such proceeds to be then so applied . . . .

****

(g)   Borrower's interference with Lender's exercise of rights under the Assignment of Leases and Rents . . . .

12.   All documents attached to the Declaration of Aaron Feagan (Doc. 51-1) are true and accurate copies of the documents, and the parties do not dispute the authenticity of those documents.

13.   Original Lender assigned, transferred and conveyed all of Original Lender's rights, title and interest in the Loan Documents and other related documents to the Bank of America, National Association, successor by merger to LaSalle Bank National Association for the registered holders of GE Capital Commercial Mortgage Corporation, Commercial Mortgage Pass-Through Certificates, Series 2001-1 ("Bank of America") pursuant to the terms of four Assignments of Mortgage and Assignment of Leases and Rents, each dated April 27, 2001.

14.   Bank of America, subsequent to the filing of this action, assigned, transferred and conveyed all of its rights, title, and interest in the Loan Documents and other related documents to U.S. Bank National Association, as Trustee,

successor in interest to Bank of America, National Association, successor by merger to LaSalle Bank National Association for the registered holders of GE Capital Commercial Mortgage Corporation, Commercial Mortgage Pass-Through Certificates, Series 2001-1.

**Failure to Pay Debt Service and Letters to NOM**

15.     Since August 2009, Borrowers have failed to make payments as required by the Notes, except that they paid $72,120 to Plaintiff pursuant to a Florida court order in August 2010.

16.     NOM stopped remitting the debt service on behalf of Borrowers in August of 2009; Mr. Newton, Mr. Oldacre, and Mr. McDonald, along with NOM's management and legal counsel, were involved in the decision to stop making loan payments.

17.     Since August of 2009, no rents, profits, or other sums from the properties have been paid to Plaintiff, with one exception. Instead, NOM transferred those amounts to itself in alleged repayment of advances NOM previously made to the Borrowers.

18.     On or about October 22, 2009, Plaintiff sent four letters (one for each property) to Borrowers and NOM, stating that the August 2009 payment was delinquent and advising the Borrower that future communications regarding the

loans should be directed to Centerline, the predecessor to the current special servicer, C-III.

19.     On or about November 20, 2009, Plaintiff sent four letters (one for each property) to Borrowers and copied NOM and the Joinder Parties. The letters notified the Borrowers of the Plaintiff's revocation of the Borrowers' license to collect Rents from the Properties and declared the entire outstanding principal balance of the Note due and immediately payable.

20.     Between May 19, 2010 and May 26, 2010, Plaintiff sent letters to NOM at its address referencing the Acknowledgments of Property Manager and providing notice "pursuant to Section 5 of the Acknowledgment of Property Manager that an Event of Default has occurred under the Note and/or other Loan Documents and as a result of such Event of Default, Noteholder has revoked Borrower's license to collect the Property Proceeds as defined in and pursuant to the terms of the Assignment of Leases and Rents dated as of February 5, 2001 by Borrower to Original Lender."

**NOM's Use of the Property Proceeds**

21.     Though under no obligation to do so, NOM knowingly and willingly elected to provide funds as alleged advances to Borrowers whenever a property did not generate enough income to pay both debt service and operating expenses. NOM allegedly advanced $6,798,370 to the Borrowers.

22.     Since the loans' origination, the Borrowers submitted regular financial statements and reports to the Lender containing a to/from column showing amounts allegedly due to (or from) NOM.

23.     After the October and November 2009 letters to the Borrowers, NOM continued to manage the Borrowers' properties and directed the transfer of rent funds received to pay NOM's management fee, the properties' operational expenses, and to allegedly repay advances that NOM previously made to the Borrowers.

24.     No one connected with Plaintiff, any lender, or any servicer of the loans at issue in this action ever directed NOM or the Joinder Parties to make advances or otherwise transfer funds to the Borrowers, whether to cover shortfalls in debt service or for any other purpose.

25.     Over the course of NOM's relationship with Borrowers, NOM allegedly advanced significant sums to the Borrowers and the Borrowers periodically allegedly repaid portions of these alleged advances.

26.     When the economy deteriorated, and it became clear to NOM that the properties' performance was unlikely to improve, NOM ceased remitting debt service payments on behalf of the Borrowers and began applying monies the Borrower collected towards the alleged repayment of the advances NOM had made to Borrowers.

27.     Post-default, NOM transferred funds from the Borrowers to NOM in alleged repayments of loan advances in the amount of not less than $1,584,628.

28.     The Joinder Parties, along with NOM's management and legal counsel, were involved in the decision to make post-default payments to NOM for alleged prior advances that NOM made to Borrowers before and instead of paying debt service to Plaintiff.

29.     By letters dated July 2010, Plaintiff notified the Borrowers' tenants of the Borrowers' default and requested that the tenants remit rents directly to the Plaintiff.

30.     By letters dated August 25, 2010, NOM advised the Plaintiff of its resignation as property manager for the Borrowers' properties.

31.     Plaintiff objected to NOM's resignation.

**Foreclosure of the Properties**

32.     In the 2009 and May 2010 Letters, Plaintiff expressly reserved any and all rights and remedies contained in, and with respect to, the loan documents, including foreclosure.

33.     At C-III's direction on behalf of Plaintiff, the four properties that served as collateral for the Loans were foreclosed upon under the Loan Documents.

34.     NOM was not paid for any property management services for August and September 2010.

6.     <u>TRIAL SETTING:</u>        This case is set for a non-jury trial on June 18, 2012, commencing at 9:00 a.m. in Montgomery Alabama.

8.     <u>MOTIONS IN LIMINE:</u>        Any motions in limine or similar motions must be filed **not later than two weeks** prior to the trial date and must be accompanied by a brief.  Responses to these motions shall be filed **not later than one week** prior to the trial date.

9.     <u>EXHIBITS:</u>        All exhibits shall be marked prior to trial with labels which are available from the clerk's office.  In addition to the original exhibits marked for introduction, each party shall have available copies of each photostatically reproducible exhibit as follows: (1) one copy for each opposing party and (2) one copy for the court which shall be contained in a notebook with each exhibit tabbed in the order which counsel expects to introduce the exhibit.  On the first day of trial, counsel shall provide an exhibit list to the court (2 copies) and to each party.  The exhibit list shall conform to the format provided to the parties during the pretrial conference.

10.     It is ORDERED that all of the allowances and agreements contained in this order be, and the same are hereby, binding upon all parties in this case unless this order is hereafter modified by the court.

Done this 15th day of May, 2012.


                    _____/s/Charles S. Coody_____
                    CHARLES S. COODY
                    UNITED STATES MAGISTRATE JUDGE