IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BANK OF AMERICA, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO.  2:10cv975-CSC |
| | ) | (WO) |
| THOMAS E. NEWTON, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

_____

| | | |
|---|---|---|
| BANK OF AMERICA, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO.  2:10cv976-CSC |
| | ) | (WO) |
| NEWTON OLDACRE | ) | |
| MCDONALD, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

**I.  Introduction**

Commercial television programs are sometimes interrupted by a rather aggravating advertisement touting the alleged benefits of selling a structured settlement or fixed annuity for a lump sum cash payment.  A viewer's attention to this entreaty is captured by a person yelling, "It's my money, and I need it now."  Unfortunately, all of the parties to these lawsuits in one way or another took the same approach to their dealings with each other.  Unsurprisingly, that resulted in this litigation.

At issue in these cases are four loans held by plaintiff Bank of America.  The Borrower on each loan is a limited liability company, and the loans are secured by parcels of real property located in Alabama, Tennessee, Florida and Mississippi.  Defendants Thomas E. Newton ("Newton"), William A. Oldacre ("Oldacre"), and Mark McDonald ("McDonald") are business partners who develop and manage commercial real estate.  They formed a limited liability company, Newton Oldacre McDonald LLC ("NOM"), to manage the commercial real properties they develop.  NOM Bessemer is the limited liability company and  Borrower of the loan secured by the parcel of real property located in Alabama.  NOM Clarksville is the limited liability company and Borrower on the loan secured by the parcel of real property located in Tennessee.  98 Palms is the limited liability company and Borrower on the loan secured by the parcel of real property located in Florida.  NOM Pascagoula is the limited liability company and Borrower on the loan secured by the parcel of real property located in Mississippi.  Newton signed the loan documents for each loan in his capacity as President of each limited liability company.  Newton, Oldacre and McDonald guaranteed each loan and are the joinder parties in these actions.  Defendant NOM was the Property Manager for each property.[1]

The plaintiff brings a breach of contract claim against all defendants, and fraudulent conveyance and breach of fiduciary duty claims against NOM.  Also before the court is NOM's counterclaim alleging breach of contract, or in the alternative, quantum meruit

---

[1]  The individual defendants are also the managing members of NOM.

against the plaintiff.[2]

The court has jurisdiction over these claims pursuant to its diversity jurisdiction. *See* 28 U.S.C. § 1332(a)(1).  Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to a United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment.

On May 24, 2011, the court granted the parties' joint motion to consolidate *Bank of America v. Newton Oldacre McDonald, LLC*, 2:10cv976-CSC (M.D. Ala.) and *Bank of America v. Thomas Newton, et al.*, 2:10cv975-CSC (M.D. Ala.) because both cases involve common questions of law and fact, and judicial economy was best served by consolidating these actions.  A bench trial has been held, and the court now makes the following findings of fact and conclusions of law.[3]

## II.  Findings of Fact[4] and Conclusions of Law

The Borrowers in these cases each entered into a loan agreement with the original lender, General Electric Capital Corporation ("GECC").  (Pl's Tr. Exs. 1-21).  GECC then assigned, transferred and conveyed all of its rights, title and interest in the loan documents

---

[2]  In the Pretrial Order, NOM conceded that its claims for conversion and intentional interference with a contractual relationship were due to be dismissed.  (Doc. # 65 at 21).  Accordingly, those counterclaims will be dismissed.

[3]  Also pending before the court is Bank of America's motion for summary judgment.  (Doc. # 51). The court carried the motion for summary judgment with the bench trial which is now due to be denied as moot.

[4]  The facts are largely undisputed, and include the parties' stipulations as set forth in the pretrial conference order.

and other related documents to the Bank of America, pursuant to the terms of four Assignments of Mortgage and Assignment of Leases and Rents, each dated April 27, 2001. Bank of America, subsequent to the filing of these actions, assigned, transferred and conveyed all of its rights, title, and interest in the loan documents and other related documents to U.S. Bank National Association, as Trustee, the successor in interest to Bank of America, National Association, successor by merger to LaSalle Bank National Association for the registered holders of GE Capital Commercial Mortgage Corporation, Commercial Mortgage Pass-Through Certificates, Series 2001-1 acting by and through C-III Asset Management LLC, solely in its capacity as Special Servicer.  (Pl's Tr. Exs. 21-24).  For simplicity, the court refers to the plaintiff as the Bank.

Each loan agreement was evidenced by a note executed by each Borrower for its respective loan.  There are four sets of loan documents, and each set of documents represents a loan for property in each state where the Borrower was to finance shopping center projects: Alabama, Tennessee, Florida and Mississippi.   (Pl's Tr. Exs. 1-21).   The cross-collateralization of the properties, in which each property is pledged as collateral for all four loans, has been at the heart of this dispute.  Each note was secured by a mortgage and an assignment of rents executed by each Borrower for the benefit of the Bank encumbering the assets described therein.  The loan documents include a Loan Agreement, Promissory Note, Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing, Security Agreement, and a separate Assignment of Leases and Rents.

4

The loan documents are materially identical, except that each loan is for a different amount of money and different state law requirements, depending on the location of the real property. When the loan documents were signed, NOM executed an Acknowledgment of Property Manager for each property. Attached as an Exhibit to each Acknowledgment is the Property Management Agreement between NOM and each Borrower setting forth the terms of NOM's management of the Borrowers' properties. In the Acknowledgments, NOM agreed that "all payment obligations of Borrower to [NOM] for services rendered by [NOM] for the management and operation of the [Borrower] Property . . . [were] . . . subordinated to all rights of Lender[5] to receive payment from Borrower under the Note and all other amounts which may be due Lender under the Loan Documents." (Pl's Tr. Exs. 4, 9, 14 & 19 at 1, ¶ 1). Additionally, in Recital D of the Acknowledgments NOM "agreed to subordinate any rights to payment under the [Management Agreement] to Lender's liens more particularly described in the Mortgage and Loan Documents (as that term is defined in the Loan Agreement)." (*Id*. at 1). NOM also agreed "that any and all rents, profits or other sums . . . collected or received by [NOM] from the Propert[ies] are subject to a security interest of Lender pursuant to the Loan Documents." (*Id*. at 2, ¶ 5). Finally, in the Acknowledgments, NOM agreed that any and all rents, profits or other sums collected or received by NOM would be used for proper expenses and costs of managing and operating the Properties as permitted under the Management Agreements and would be held "in trust

---

[5] Of course, the "Lender" and the "Bank" are the same entity.

for the benefit" of Borrowers and the Bank.

Pursuant to the Acknowledgments, and upon written notice that an event of default had occurred under the notes and that a Borrower's license to collect the Property Proceeds had been revoked, NOM agreed "(i) not to pay any of the Property Proceeds to Borrower without the prior written approval of Lender, (ii) to pay the Property Proceeds in payment of the Indebtedness . . . or to otherwise pay such Property Proceeds as instructed by the Lender, and (iii) to cooperate in the establishment of a lock box, if so instructed by the Lender."  (*Id*. at 2, ¶ 5).

The loan documents, coupled with the Acknowledgments and Management Agreements govern the resolution of the parties' claims.

Newton, Oldacre and McDonald, as the three individual members of NOM, each executed a Joinder for each Loan Agreement in which the three individual defendants jointly and severally personally guaranteed performance by the Borrowers of all obligations and liabilities for which the Borrowers were personally liable under Section 12.1 of the Loan Agreements.  Specifically, each Joinder stated that the individual defendants:

> jointly and severally guarantee the performance by Borrower of all obligations and liabilities for which Borrower is personally liable under Section 12.1 of this Agreement.  This Joinder is a guarantee of full and complete payment of performance and not of collectability.

(Pl's Tr. Exs. 5, 10, 15 & 20 at 1).

Section 12.1 of the Loan Agreements, in conjunction with the Joinders, protect the Bank's secured interests in the Properties and rents.  In Section 12.1, the Borrowers each

agreed to be

> personally liable to [the Bank] for any *deficiency, loss or damage* suffered by [the Bank] because of . . . (c) the misapplication by Borrower or any Borrower Party of any funds derived from the Project, including security deposits, insurance proceeds and condemnation awards, in violation of this Agreement or any of the other Loan Documents . . . (f) Borrower's failure to apply proceeds of rents or any other payments in respect of the leases and other income of the Project or any other collateral when received to the costs of maintenance and operation of the Project and to the payment of taxes, lien clams, insurance premiums, Debt Service, the Funds, and other amounts due under the Loan Documents to the extent the Loan Documents require such proceeds to be then so applied; (g) Borrower's interference with Lender's exercise of rights under the Assignment of Leases and Rents. . . .

(Pl's Tr. Exs. 1, 6, 11 & 16 at 35, Section 12.1)[6]

When the Borrowers were current on their debt service payments, under the loan documents and the property management agreements, NOM was entitled to any rent monies remaining after the debt service payments were made, and could use those funds in any manner it saw fit.  From the onset, NOM Clarksville and NOM Pascagoula were profitable properties.  NOM Bessemer was not as lucrative but profits from 98 Palms were non-existent.[7]  Based on its interpretation of Section 5 of the Management Agreement,[8] NOM

---

[6]   The philosopher Ludwig Wittgenstein observed that "Philosophy is a battle against the bewitchment of our intelligence by means of language."  PHILOSOPHICAL INVESTIGATIONS 47 (1953). Obviously the drafters of these loan documents taken as a whole lost that battle.

[7]  98 Palms was the proverbial "money pit."

[8]  Section 5 of the Management Agreement provides in pertinent part that "[i]f Agent elects to advance any money in connection with the Premises to pay any expenses for Owner, such advance shall be considered a loan subject to repayment with interest, and Owner hereby agrees to reimburse Agent, including interest as provided in paragraph 17.7, and hereby authorizes Agent to deduct such amounts from any monies due Owner."  (Pl's Tr. Exs. 4, 9, 14 & 19, Att. A at 4).

advanced monies from NOM Clarksville and NOM Pascagoula to 98 Palms to pay operating expenses to prevent 98 Palms from falling into a financial abyss.

When the economy deteriorated, and it became apparent to NOM that it could no longer continue to support 98 Palms and NOM Bessemer from the profits of NOM Clarksville and NOM Pascagoula, NOM ceased remitting debt service payments on behalf of all the Borrowers.  Apparently NOM viewed this default as an appropriate way to encourage the Bank to renegotiate the Borrowers' loans.  NOM also began applying monies the Borrowers collected towards the repayment of the advances NOM previously made to the Borrowers.  NOM stopped remitting the debt service payments on behalf of the Borrowers in August 2009, and has not made any debt service payments as required by the notes since that time.  Newton, Oldacre, and McDonald, along with NOM's management and legal counsel, were involved in the decision to stop making debt service payments. Since August 2009, no rents, profits, or other sums from the properties have been paid to the Bank.[9]  Instead, NOM transferred rents, profits and other amounts to itself, to repay advances NOM previously made to the Borrowers.

Upon default, the loans moved into a special servicing arena, and the Bank retained C-III Capital Partners to service the loans.  Aaron Feagan ("Feagan") is employed by C-III Capital Partners as a special servicing officer, and he was assigned to the loans after the

---

[9]  There is one exception - Borrower 98 Palms paid $72,120.00 pursuant to a Florida court order in August 2010.

Borrowers failed to make their debt service payments.[10]  When Feagan received the files on the Borrowers' loans, he communicated with the Borrowers by letter about the loans.  On or about October 22, 2009, Feagan, on behalf of the plaintiff, sent a letter for each property to the Borrowers and to NOM, stating that the August 2009 payments were delinquent and advising each Borrower that future communications regarding the loans should be directed to Centerline, the predecessor to the current special servicer, C-III.  Feagan also advised the Borrowers to begin making the requisite monthly debt service payment for each loan.  The October 22, 2009 letters did not revoke the Borrowers' licences to collect rents from the Properties.  None of the Borrowers resumed payment of the monthly debt service.

On or about November 20, 2009, Feagan, through counsel, sent each Borrower another letter, informing them that the loans were in default, demanding payment and accelerating each debt.  He also copied NOM and the Joinder Parties on the letters. The November 20, 2009 letters declared the entire outstanding principal balance of each note due and immediately payable and unequivocally notified the Borrowers that their licenses to collect rents from the Properties were revoked.

> You are hereby further notified that Borrower's license to collect and receive the rents and other revenues related to the Property granted under the Loan Documents including the Mortgage and Lease Assignment is hereby revoked effective immediately as provided, *inter alia*, in Section 5.1 of the Mortgage and Section 6 of the Lease Assignment.  You are hereby notified that Lender is entitled immediately to possession of all rents, revenues or other proceeds

---

[10]  Feagan was relatively new to the field of special servicing of commercial mortgage-backed security lending.  (Trial Tr. at 64) (References to the Trial Transcript refer to the copy of the transcript prepared for the court's use.)

9

from the Property or Collateral (the "Rents") collected or received by Borrower.  Lender hereby demands a full and complete accounting of all Rents received by Borrower, and the remittance of all Rents received by Borrower.

(Pl's Tr. Exs. 32-35 at 2; Defs' Tr. Ex. 8 at 2).

After the November 2009 letters to the Borrowers, NOM continued to manage the Borrowers' properties.  NOM also directed the transfer of rent funds received by the Borrowers to pay NOM's management fee, the properties' operational expenses, and to repay advances NOM asserts it previously made to the Borrowers.  However, once the Borrowers defaulted on their loans, and the Bank revoked the Borrowers' licenses to collect the rents, it is clear from the loan documents any funds collected from the Properties belonged to the Bank.

In December 2009, Feagan received loan modification proposals from the Borrowers. On behalf of the plaintiff, Feagan rejected the proposals.  In March 2010, the Borrowers submitted another loan modification proposal.  However, Feagan notified the Borrowers that no loan modification proposal would be acted on until the Borrowers began remitting the net cash flow from each property.  Net cash flow consists of rent payments less any operating expenses.  The Borrowers did not remit any net cash flow.

Between May 19 and May 26, 2010, the Bank sent letters to NOM referencing the Acknowledgments of Property Manager and providing notice again that "pursuant to Section 5 of the Acknowledgment of Property Manager that an Event of Default has occurred under the Note and/or other Loan Documents and as a result of such Event of Default, Noteholder

10

has revoked Borrower's license to collect the Property Proceeds as defined in and pursuant to the terms of the Assignment of Leases and Rents dated as of February 5, 2001 by Borrower to Original Lender." (Defs' Tr. Ex. 9)

Because the Borrowers did not make any debt service payments and did not remit any net cash flow, the plaintiff initiated foreclosure proceedings on all four pieces of the cross-collateralized properties.

In July 2010, after NOM continued to fail to remit the net cash flow, the plaintiff took action to redirect the rents. By letters dated July 2010, the plaintiff notified the Borrowers' tenants of the Borrowers' default and requested that the tenants remit rents directly to the plaintiff. In response to the plaintiff's redirection of the rents, on August 25, 2010, NOM attempted to resign as property manager for all four Borrowers, effective immediately with the notice. The plaintiff objected to NOM's resignation because the Management Agreements required NOM to give thirty days notice prior to resigning. The plaintiff required NOM to continue to manage the properties. It is undisputed that NOM was not paid for any property management services for August and September 2010.

In all of the letters sent to the Borrowers, the plaintiff expressly reserved any and all rights and remedies contained in, and with respect to, the loan documents, including foreclosure. At C-III's direction on behalf of the Bank, the four properties that served as collateral for the loans were foreclosed on in accordance with the loan documents. NOM Clarksville was foreclosed in August 2010. NOM Bessemer and NOM Pascagoula were

11

foreclosed in September 2010. 98 Palms was placed under a court-ordered receivership, and foreclosed in April 2011.

Over the course of NOM's relationship with the Borrowers, though under no obligation to do so, NOM knowingly and willingly elected to pool funds from successfully performing properties to provide funds as advances to the Borrowers whenever another property did not generate enough income to pay both debt service and operating expenses. According to NOM, it routinely advanced significant sums to the Borrowers, and the Borrowers periodically repaid portions of these advances. NOM kept track of these advances in a "to/from" column in its balance sheets showing the transfer of funds.[11] Although NOM asserts that it advanced $6,798,370.00 to the Borrowers, no loan documents were created to protect the advances as loans. At trial, the evidence was clear that NOM was using funds from the profitable properties, NOM Clarksville and NOM Pascagoula, to prop up NOM Bessemer and to attempt to save the financially destitute 98 Palms. NOM routinely utilized the profits of NOM Clarksville and NOM Pascagoula to sustain 98 Palms.

At trial, Feagan testified that between October 8, 2009 and July 8, 2010, NOM transferred $1,489,718.95 from the Borrowers to NOM to repay these advances. It is undisputed that the Joinder Parties, along with NOM's management and legal counsel, were

---

[11] It is undisputed that since the loans' origination, the Borrowers submitted regular financial statements and reports to the Bank containing a "to/from" column showing amounts NOM contends were either due to NOM from the Borrowers or due from NOM to the Borrowers. It is also undisputed that no one connected with the plaintiff, any lender, or any servicer of the loans at issue in these actions ever directed NOM or the Joinder Parties to make advances or otherwise transfer funds to the Borrowers, whether to cover shortfalls in debt service or for any other purpose.

involved in the decision to make the post-default payments to NOM instead of paying debt service to the plaintiff.  The Borrowers and NOM received notice in November 2009 that the Borrowers' licences to collect rents were revoked.  Beginning on December 9, 2009, characterizing the transfers as repayment of loans to NOM, the Borrowers transferred a total of $967,000.00 to NOM in the following manner:  NOM Clarksville transferred $395,000.00; 98 Palms transferred $460,000.00; NOM Bessemer transferred $10,000.00; and NOM Pascagoula transferred $102,000.00.  (Pl. Tr. Ex. 41, Bate Stamped doc. # 000749).

On August 25, 2010, after NOM attempted to resign as Property Manager for the Borrowers, Sam Colson, on behalf of NOM, authorized the transfer from the Borrowers' checking accounts of funds to NOM "as repayment of the net advances that NOM is still owed by this portfolio."  (Pl's Tr. Ex. 71).  NOM Bessemer transferred $7,885.49, NOM Clarksville transferred $30,253.09, NOM Pascagoula transferred $595.52, and 98 Palms transferred $58,093.42 for a total transfer of $96,827.52.  Consequently, NOM received a total of $1,063,827.52 in rent proceeds after the revocation of the Borrowers' licences to collect rents in November 2009.

### III. Discussion of Claims

In this litigation, the plaintiff Bank contends that the defendants have misapplied rents in the amount of $1,584,628.00, thereby violating Section 12.1 of the Loan Agreements and triggering personal liability for the Borrowers as well as the Joinder Parties and NOM.  The

plaintiff calculates its damages from the date of default by the Borrowers in August 2009. The court addresses the plaintiff's claims in seriatim.

   *A. The Bank's Breach of Contract claim against all defendants.*

   The plaintiff contends that the defendants breached the loan agreements, acknowledgments of property managers, and joinder agreements when they failed to remit the rent proceeds from the Borrowers' properties after being notified that the licenses to collect rents were revoked.  The plaintiff further contends that because the  contracts contain an "absolute assignment of rents" clause, it is entitled to damages from the date of default on the loans, not the date of the breach.

   To establish a breach of contract claim under Alabama law, the plaintiff must establish the following elements:

> (1) the existence of a valid contract binding the parties in the action, (2) [the plaintiff's] own performance under the contract, (3) the defendant's nonperformance, and (4) damages.

*Southern Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995).  *See also Reynolds Metals Co. v. Hill*, 825 So.2d 100, 106 (Ala. 2002); *Congress Life Ins. Co. v. Barstow*, 799 So. 2d 931, 938 (Ala. 2001).

   The parties do not dispute that the loan documents create valid binding contracts, and that the Bank performed its contractual obligations.  However, the defendants contend that they did not breach the contracts because language contained in Section 5 of the Management Agreements permitted NOM to make loans to the Borrowers and then repay those advances

14

from the rents collected even after the Borrowers went into default on their debt payments.

According to NOM, Section 5 of the Management Agreement permits NOM to treat the

advances as loans.[12]  That section reads, in pertinent part, as follows:

> If Agent elects to advance any money in connection with the Premises to pay any expenses for Owner, such advance shall be considered a loan subject to repayment with interest, and Owner hereby agrees to reimburse Agent, including interest as provided in paragraph 17.7, and hereby authorizes Agent to deduct such amounts from any monies due Owner.

(Pl's Tr. Exs. 4, 9, 14 & 19 at 4).

The defendants argue that this provision of the Management Agreement allowed

NOM to use the rents to "pay back" loans it advanced the properties before using those rents

to pay the debt service required under the Loan Agreements.   However, NOM's ability to

utilize the rents or proceeds from the properties was constrained by the Acknowledgments.

In Section 5, NOM agreed as Property Manager

> that any and all rents, profits, or other sums (collectively herein called "Property Proceeds") collected or received by Property Manager from the Property are subject to a security interest of Lender pursuant to the Loan Documents, and shall be collected and held in trust for the benefit of Borrower and Lender. . . Upon written notice from Lender that (a) an Event of Default . . . has occurred under the Note and/or other Loan Documents, and (b) *as a result of such Event of Default, Lender has revoked Borrower's license to collect the Property Proceeds pursuant to the terms of the Assignment of Leases and Rents (part of the Loan Documents), Property Manager agrees (i) not to pay any of the Property Proceeds to the Borrower without the prior written approval of Lender, (ii) to pay the Property Proceeds in payment of the Indebtedness (as such term is defined in the Mortgage or to otherwise pay such Property Proceeds as instructed by the Lender. . .*

---

[12]  The Bank argued that the "advances" were infusions of capital rather than loans.

15

(*Id.*, at Section 5) (emphasis added)

Even were the court to assume that the Management Agreements between the Borrowers and NOM permitted NOM to make loans to the Borrowers, and to seek repayment of those loans, upon written notice by the Bank of the Borrowers' defaults and the revocation of the licenses to collect rents, the Borrowers were prohibited from repaying NOM without written permission of the Bank.[13]   At least on that point, the language of the Acknowledgments is clear.  When NOM received written notice in November 2009 that the Borrowers were in default *and* that the licenses to collect rents were revoked, the Borrowers were prohibited from paying any of the property proceeds to NOM without the prior written approval of the Bank, *and* NOM was required to pay the property proceeds to the Bank in payment of the Indebtedness, *or* to hold the proceeds for the Bank.  The loan documents unequivocally gave the Bank absolute right to the rents upon notification of default *and* revocation of the licenses.  The loan documents, coupled with the Acknowledgments of the Property Manager, elevate the plaintiff's right to receive the property proceeds above NOM's right to retain the property proceeds.  Accordingly, the court concludes that the defendants breached Section 12.1(f) of the Loan Agreement when, after receipt of the November 2009 letters informing NOM of the Borrowers' defaults in conjunction with written notice that the Bank revoked the Borrowers' licenses to collect the rents, NOM continued to use property

---

[13]  The court need not decide whether the advances constituted loans because even assuming that the advances were loans, the real issue before the court is the propriety of NOM's actions in repaying itself before paying the plaintiff.

proceeds to repay itself monies advanced to the Borrowers instead of using those funds to make debt payment or holding those funds for the benefit of the Bank.  Because it is undisputed that the Joinders signed by the Joinder Parties apply to this Section of the Loan Agreements, the court concludes that the Borrowers, NOM, and the Joinder Parties are liable for the breach of contract.

NOM argues that it did not receive notice of the revocation of licences until May 2010, and thus, any monies it may owe the Bank should be calculated from the date of the May 2010 letters.  NOM is simply wrong about the notice.  The licenses to collect rent and property proceeds belonged to the Borrowers, and NOM was permitted to manage those funds provided that the Borrowers were not in default and the Borrowers had not received notice that the licenses to collect rents had been revoked.  The Borrowers received notice in November 2009 that the licenses to collect rent had been revoked.  NOM also received notice of the license revocations in November 2009.  Consequently, the court concludes that the plaintiff is entitled to recoup all the rent and other property proceeds collected by NOM and the Borrowers since November 20, 2009 until the plaintiff redirected the rents in July 2010.

Second, even assuming the advances made by NOM to the Properties were legitimate loans under the Management Agreements, the court finds that under the terms of the loan documents, NOM was not entitled to use the rents to "pay back" those loans at the expense of the Bank.  Under the terms of the Acknowledgments, NOM as property manager, explicitly and repeatedly subordinated its rights to payment under the Agreement to the rights

17

of the Bank.  So long as the loans were not in default, NOM could continue to advance monies and pay itself out of the rents.  While the Management Agreements permitted NOM to advance monies to the Borrowers, the Management Agreements did not yield the Bank's priority or rights to the rents to NOM.

The defendants argue that, because the Management Agreements allowed NOM to advance funds to the Borrowers, and because those agreements were in place before the loan documents were signed, NOM was entitled to repay itself before paying the Borrowers' indebtedness to the plaintiff.[14]  The court disagrees.  Relying solely on the Management

---

[14] It is patently obvious to the court that the defendants in these cases treated the four Borrowers as a single entity cash cow and simply transferred funds from the profitable properties to the non-profitable properties in an effort to keep them afloat.  When they defaulted on the loans, they devised a mechanism to recoup the advances, a mechanism which ignored their responsibilities to the Bank. Sam Colson, the former chief financial officer of NOM, admitted as much at trial.

| | |
|---|---|
| THE COURT: | Why did you decide to give priority to repaying yourself the loans rather than paying the debt service? |
| THE WITNESS: | I think at the time, we were not making the debt service payments because we were not funding any more deficits.  I don't know that we were necessarily looking at it as priority as much as it was we – we didn't see that the – the loans from  the lender had priority over the NOM loans.  And that was from our reading of section one of the acknowledgment. |
| THE COURT: | Well, it strikes me as an awfully odd position to take when you're trying to restructure a loan to, at the same time, tell the lender, I'm not going to pay you the debt service. |
| THE WITNESS: | I think from what we had experienced in the past, it was one way to get them to actually get to the table and negotiate. So – |
| THE COURT: | It's also a way to get as much of your loans paid as you want paid, isn't it? |
| THE WITNESS: | Certainly. |

18

Agreements, NOM ignores language in the loan documents that very clearly create an absolute interest in the rents in favor of the Bank.  The Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing clearly grant the Bank an *absolute assignment* to and a secured interest in the rents.  (Pl's Tr. Exs. 3, 8, 13 & 18, Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, Section 5.1, 6.1; Assignment of Leases and Rents, Section 1).  The Assignment of Leases and Rents explicitly grants the Bank, not NOM, the right to determine the priority of payment of debt.  "Any rents collected after the revocation of the license herein granted may be applied toward payment of the Indebtedness in *such priority and proportion as Lender, in its discretion, shall deem proper.*"  (Pl's Tr. Exs. 3, 8, 13 & 18, Section 6) (emphasis added).  The Loan Agreement clearly states that the loan documents "supersede all prior agreements and understandings between such parties" relating to the Borrowers which would include the Management Agreements.  (Pl's Tr. Exs. 1, 6, 11 & 16, Section 11.23).  Finally, the Loan Agreements state

> In any conflict or inconsistency exists between the Commitment and this Agreement, any of the other Loan Documents, . . . , the terms of this Agreement, the other Loan Documents, . . . shall control.

(*Id.*)

Under Alabama law, a contract should be construed as written.  *See Shoney's LLC v.*

---

(Trial Tr., Vol. I, at 181).

Thomas Newton, a managing member of NOM, and a principal owner of the Borrowers, admitted at trial that they chose to pay NOM back before paying the Bank even though they knew that NOM owed money to the Bank.  (Trial Tr., Vol. II, at 90)

*Mac East, LLC*, 27 So. 3d 1216, 1223 (Ala. 2009); *Reynolds*, 825 So. 2d at 107 (parties are

bound by their contracts where the terms are clear and unambiguous).

> Under general Alabama rules of contract interpretation, the intent of the
> contracting parties is discerned from the whole of the contract. *See Loerch v.*
> *National Bank of Commerce of Birmingham*, 624 So.2d 552, 553 (Ala. 1993).
> Where there is no indication that the terms of the contract are used in a special
> or technical sense, they will be given their ordinary, plain, and natural
> meaning. *Ex parte Dan Tucker Auto Sales, Inc*., 718 So. 2d 33, 36 (Ala.
> 1998). If the court determines that the terms are unambiguous (susceptible of
> only one reasonable meaning), then the court will presume that the parties
> intended what they stated and will enforce the contract as written. *See id.* at 36;
> *Voyager Life Ins. Co. v. Whitson*, 703 So.2d 944, 948 (Ala. 1997).

*Shoney's, LLC.*, 27 So. 2d at 1222 *quoting Homes of Legend, Inc. v. McCollough*, 776 So.

2d 741, 746 (Ala. 2000).

The parties to the Loan Agreements, Assignment of Rents and Leases,

Acknowledgments of Property Manager, and Management Agreements were experienced

businessmen. The loan documents were negotiated at arm's length. The court will not read

into the documents language that is not there, and is bound to enforce the plain meaning of

all provisions in the documents. Thus, even if the Management Agreement allowed NOM

to make advances to the Borrowers, a plain reading of the loan documents demonstrates that

the property proceeds were secured to the benefit of the plaintiff; the Borrowers' rights to

those proceeds were absolutely assigned and subordinated to the plaintiff's rights; and the

plaintiff's rights were superior to either the Borrowers or NOM once the Borrowers were

notified that the Borrowers were in default *and* that the licenses to receive rents were revoked

on November 20, 2009.[15]

At trial, the defendants asserted that because the properties were cross-collateralized,

NOM was permitted to advance funds *between* properties.

> A:    . . . But the account, in and of itself, does not take into consideration that these four properties were cross-collateralized.
>
> Q:    Okay.  Is there a document you can point to that says that NOM can keep taking money from properties that owe – that are owed money by NOM to fund the operations of the others?
>
> A:    I think if you take the loan documents in their totality and the fact that these properties were cross-collateralized and could be treated as a single organic loan.
>
> Q:    What do you mean the totality of the loan documents?
>
> A:    Including the acknowledgments, the property management agreements, and the fact that they were cross-collateralized.
>
> Q:    Can you point to a single loan provision that says that NOM, the management company, can pull money from profitable companies to fund unprofitable companies?
>
> A:    I cannot point to a single loan provision, no.

(Trial Tr., Vol. I, at 128)[16]

Both Colson and Newton testified repeatedly that because the properties were cross-

---

[15] The defendants argue that the loan documents only subordinated services and monies used for the operation of the properties, but that the documents do not subordinate any loans NOM made to the Bank's secured interests in the properties and the rents.  For the reasons stated in the body of this opinion, the court concludes that NOM's right to repayment of its advances was subordinated to the Bank's right to repayment of its loans.

[16] *See also*, Colson Testimony, Trial. Tr. at 129-30 ("I have a difficult time looking at NOM Clarksville as a stand-alone when the properties are cross-collateralized. . . . I think when the properties are cross-collateralized and one is completely dependent on the other, it makes it difficult to do that.")

21

collateralized, it was the practice of NOM to treat the entities and the advances "in the aggregate." (Trial Tr, Vol. I at 129, 130, 134, 135, 176, 178-81, 186; Vol. II at 79, 104). Unfortunately for the defendants, the cross-collateralization of loans is not a panacea for their actions. Contrary to the suggestion of Colson and Newton, the fact that the properties were cross-collateralized did not permit the defendants to treat the loans as "a single organic loan." (Trial Tr., Vol I at 128; Vol. II at 104). The loan documents clearly reflect that the parties intended for each Borrower to remain a separate and distinct entity from the other Borrowers, notwithstanding the fact that the loans were cross-collateralized. It is undisputed that each Borrower was a distinct limited liability company, and each Borrower signed property specific loan documents. Moreover, each Loan Agreement contained provisions that required each Borrower to remain financially independent. Section 6.14(d) of the Loan Agreement prohibited the Borrower from incurring other additional debt. Section 6.14(e) prohibited the Borrowers from making loans or advances to "any third party (including any affiliate or constituent party or any affiliate of any constituent party), and shall not acquire obligations . . . of its affiliates or any constituent party." Section 6.14(f) required the Borrower to pay debts from its own assets. Section 6.14(l) prohibited the Borrowers from co-mingling funds or assets with any other affiliate or constituent party. (Pl's Tr. Exs. 1, 6, 11 & 16 at 20). Clearly the parties contemplated that the Borrowers would remain financially separate and distinct, and NOM knew that, as Colson testified at trial.

> Q: And isn't it true that the borrowers agreed to maintain themselves as separate entities?

A:      Yes.

Q:       And they pledged – the borrowers pledged to maintain themselves as
        independent from one another, right?

A:      Sure.

Q:      But in this case, they can move cash to and from one another, right?
        That's your position?

A:      I'm not sure what you're referring to as how they pledged to remain
        independent.  I mean they're independent legal entities, of course.

(Trial Tr., Vol. I, at 130-31).

Finally, Colson and Newton conceded at trial that the cross-collateralization was for the benefit and protection of the Bank, not the Borrowers.  (Trial Tr., Vol. I at 176; Vol. II at 71).  Accordingly, the court concludes that NOM's reliance on the cross-collateralization of the Borrowers' loans to elevate its loans above the Bank's is misplaced.  Once the Borrowers and NOM were notified that the Loans were in default and that the Borrowers' licenses to collect rents were revoked, the loan documents very clearly grant the Bank absolute entitlement to those rents, and the cross-collateralization of the loans does not in any way affect the Bank's rights.

In establishing damages, the plaintiff relies on *Homecorp v. Secor Bank*, 659 So. 2d 15 (Ala. 1995), to argue that, upon declaration of default of the loans, it is entitled to recoup all rent proceeds from the moment of default, not the point of the breach.  Consequently, the Bank asserts it is entitled to repayment of $1,584,628.00 which is the total amount that NOM transferred from the Borrowers to itself after default in August 2009 until the Bank redirected

23

the rents in July 2010.  The plaintiff is simply wrong.   In Section 1 of the Acknowledgment

of Property Manager, the

> Property Manager hereby agrees that all payment obligations of Borrower to
> Property Manager for services rendered by Property Manager for the
> management and operation of the Property, as such services are more
> particularly described in the Contract, are hereby subordinated to all rights of
> the Lender to receive payment from Borrower under the Note and all other
> amounts that may be due Lender under the Loan Documents.  Property
> Manager recognizes and agrees that *so long as* the Note is being paid in strict
> accordance with its terms and all other requirements of the Loan Documents
> are being satisfied, Property Manager shall be entitled to receive payments
> provided for under the Contract in accordance with the terms thereof.  The
> Property Manager shall be entitled to assume that the Note is being paid in
> accordance with its terms and all other requirements of the Loan Documents
> are satisfied, *until notified by Lender of such change*.

(Pl's Tr. Exs., 4, 9, 14 & 19, Section 1) (emphasis added).

NOM's rights to receive and utilize the rent proceeds was dependent on the notes

being paid in accordance with the loan documents.  The plaintiff initially asserted that

because the defendants were notified in the October 2009 letters that the loans were in

default, it was entitled to recover damages based on this notification.  In pertinent part, the

October 2009 letters refer to the loans as delinquent, and advise the Borrowers that, "if the

Borrower[s] fail[] to timely cure the payment delinquencies. . ., the lender *may exercise* its

rights and remedies available" under the loan documents.  (Pl's Tr. Exs. 28-31; Defs' Tr. Ex.

7).  The court finds that the October 2009 letters do not sufficiently notify NOM that the

loans were in default.  Because section 1 of the Acknowledgments permitted NOM to assume

that the notes were being paid *until notified by Lender of such change*, the court concludes

24

that the October 2009 letters do not suffice to notify NOM that *such change* has occurred. Moreover, neither the documents, nor the parties, define the "change" contemplated by section 1. Thus, the court finds the language in this section to be ambiguous, and construes the ambiguity against the Bank as the drafter of the document. *See Cavalier Mfg., v. Clarke*, 862 So. 2d 634, 642 (Ala. 2003).

It was not until the November 2009 letters that the plaintiff notified the Borrowers that the loans were in default.

> Events of Default have occurred and are continuing under the Loan Documents, specifically including without limitation, the failure of Borrower to make payments of principal, interest and other amounts payable under the Loan Documents when due and payable (the "Existing Default"). Based on the Existing Default, Lender has the right to exercise any and all of its remedies under the Loan Documents or otherwise at law.

(Pl's Tr. Exs. 32-35 at 2; Defs' Tr. Ex. 8).

Furthermore, the language of the loan documents entitled NOM to collect the property proceeds until it was notified that the Borrowers were in default, *and* that the Borrowers' licenses to collect rents were revoked.[17] NOM was notified in the November 20, 2009 letters.

> You are hereby further notified that Borrower's license to collect and receive rents and other revenues related to the Property granted under the Loan Documents including the Mortgage and Lease Assignment is hereby revoked effective immediately as provided, *inter alia*, in Section 5.1 of the Mortgage and Section 6 of the Lease Agreement. You are hereby notified that Lender is entitled to immediate possession of *all rents, revenues or other proceeds from the Property or Collateral (the "Rents") collected or received by Borrower. Lender hereby demands a full and complete accounting of all Rents*

---

[17] At trial Feagan admitted, and the evidence demonstrates, that the October 2009 letters did not revoke the Borrowers' licenses to collect rents. (Trial Tr., Vol. I at 72-74).

*received by Borrower, and the remittance of all Rents received by Borrower.*

(*Id.*) (emphasis added)

The court concludes that based upon the language in section 1, coupled with the language contained in the October and November 2009 letters, the Borrowers and NOM received notice of *such change* sufficient to trigger Section 5 of the Acknowledgments requiring NOM and the Borrowers to hold the rents and property proceeds for the Bank in the November 20, 2009 letters.  Instead, however, beginning on December 9, 2009, the Borrowers transferred a total of $967,000.00 to NOM in the following manner:  NOM Clarksville transferred $395,000.00; 98 Palms transferred $460,000.00; NOM Bessemer transferred $10,000.00; and NOM Pascagoula transferred $102,000.00. (Pl. Tr. Ex. 41, Bate Stamped doc. # 000749).  In addition, on August 27, 2010, Colson authorized the transfer of funds from the Borrowers' checking accounts to NOM in the following amounts: $7,885.49 from NOM Bessemer; $30,253.09 from NOM Clarksville; $595.52 from NOM Pascagoula; and $58,093.42 from 98 Palms for a total transfer from the checking accounts in the amount of $96,827.52.  Accordingly, the court concludes that the plaintiff is entitled to recoup $1,063,827.52, plus interest, which is the amount NOM received in rent proceeds from the November 20, 2009 notifications of the Borrowers' revocation of its licences to collect rents until the Bank redirected the rents in July 2010.

On the other hand, NOM argues that the November 2009 letters were insufficient to revoke the licenses to collect rent because those letters did not reference the

Acknowledgments of Property Manager, and the Acknowledgments of Property Manager were the only documents signed by NOM.  Thus, NOM contends that it did not receive proper notice until it received the May 19, 2010 letters, and any failure to remit rents did not occur until after that date.  NOM ignores the language in the loan documents that governs notice.  Section 11.1 of the Loan Agreement specifically states that

> [a]ny notice required or permitted to be given under this Agreement shall be in writing and either shall be mailed by certified mail, postage prepaid, return receipt requested, or sent by overnight air courier service, or personally delivered to a representative of the receiving party, or sent by telecopy (provided an identical notice is also sent simultaneously by mail, overnight courier, or personal delivery as otherwise provided in this Section 11.1.

(Pl's Tr. Exs. 1, 6, 11 & 16, Section 11.1)  The Loan Agreement sets forth the addresses to which notices must be sent.[18]  (*Id*.)  The Agreement further defines the Loan Documents as

> (a) this Agreement, (b) the Note, (c) the Mortgage, (d) the Assignment of Leases and Rents, (e) Uniform Commercial Code financing statements, (f) such assignments of management agreements, contracts and other rights as may be required under the Commitment or otherwise requested by Lender, (g) all other documents evidencing, securing, governing or otherwise pertaining to the Loan, and (h) all amendments, modifications, renewals, substitutions and replacements of any of the foregoing; . . .

(*Id*. at Section 1.1 at 3).  At a minimum, the Acknowledgments of Property Manager constitute a document that "otherwise pertain[s] to the Loan."  Moreover, Thomas Newton, a managing member of NOM and a principal owner of the Borrower Properties, testified that the Acknowledgments of Property Manager were part of the loan documents.  (Trial Tr., Vol.

---

[18]  It is undisputed that notifications were sent to all the defendants at the addresses specified in the loan agreements.

II at 75).  Thus, notice to the Borrowers was also notice to NOM under the terms of the loan documents' notification provisions.  The court concludes that the letters of November 20, 2009, revoking the Borrower's licenses to collect rents were sufficient notice to NOM that it was required to hold the proceeds for the plaintiff, and that it was not permitted to pay any proceeds to the Borrowers without prior written approval from the plaintiff.[19]

When the Borrowers and NOM withheld the property proceeds, they breached Section 12.1 of the Loan Agreements by misapplying funds, failing to properly apply the rent proceeds, and interfering with the Bank's exercise of its rights to the rent proceeds.  The breach of Section 12.1 triggered the application of the Joinder Agreements in which the individual defendants "jointly and severally guaranteed the performance by Borrower of all obligations and liabilities for which Borrower is personally liable under Section 12.1 of this Agreement."  Accordingly, for the reasons as stated, the court concludes that judgment will be entered in favor of the plaintiff, and against the defendants, on count one of the complaint, the breach of contract claim.  The plaintiff is entitled to recover the property proceeds remitted to NOM from the Borrowers from November 20, 2009 until the Bank redirected the rents in July 2010, which the court concludes from the evidence totals $1,063,827.52, plus interest pursuant to ALA CODE § 8-8-8 (1975).

---

[19]  The court finds the defendants' position that notice to the Borrowers of the revocation of the licenses was not sufficient to put NOM on notice to be particularly disingenuous in light of the fact that the "managing members" of NOM were also the principals owners of the Borrower Properties, and NOM only managed properties in which its members owned interest.

*B.  The Bank's Fraudulent Conveyance Claim against NOM*

The Bank contends that by using rents to pay loans advanced to the Borrowers, NOM fraudulently conveyed those funds to itself.[20]  To establish a fraudulent conveyance under Alabama law,[21] the plaintiff must establish: "(1) a creditor to be defrauded; (2) a debtor intending to defraud; and (3) a conveyance of property out of which the creditor could have realized his claim or some portion thereof."  *Champion v. Locklear,* 523 So. 2d 336, 338 (Ala. 1988) (citations omitted).  *See also Cox v. Hughes,* 781 So. 2d 197, 201 (Ala. 2000); *Welch v. Graham*, 623 So. 2d 1027, 1029 (Ala. 1993).  However, "[c]oncurrence of the three elements is not enough to set aside the conveyance when there is a valuable consideration given for the transfer."  *Welch*, 623 So. 2d at 1029.

> An existing creditor seeking to set aside a conveyance may do so because of either actual fraud or constructive fraud.  Actual fraud denotes the actual mental operation of intending to defeat or delay the rights of the creditor.  On the other hand, constructive fraud is based on facts and circumstances which courts have said constitute legal fraud, regardless of actual intent.  The term "constructive fraud" is generally used to refer to those instances where a grantor, indebted at the time, conveys property without receiving valuable consideration.

*Granberry v. Johnson*, 491 So. 2d 926, 928 (Ala. 1986).

---

[20]   It appears to the court that the plaintiff is attempting to reframe its contract claim in an effort to create a claim sounding in tort.

[21]   The law on fraudulent conveyance is codified at ALA. CODE § 8-9-6 (1975).

All conveyances or assignments in writing, or otherwise, of any estate or interest in real or personal property . . . made with intent to hinder, delay or defraud creditors, purchasers or other persons of their lawful actions, damages, forfeitures, debts or demands . . . are void.

(*Id.*)

The plaintiff does not specify whether NOM's fraudulent conveyance was actual or constructive fraud.[22]  In the pretrial order, the plaintiff refers the court to law related to constructive fraud.  "[W]ithout regard to actual intent, the law will find a constructive fraud when a grantor, indebted at the time, conveys property without receiving valuable consideration."  (Doc. # 65 at 9, ¶ 6 *quoting Champion*, 523 So. 2d at 338.)

To the extent that the plaintiff argues that NOM's actions constitute constructive fraud, it is entitled to no relief.  It is not sufficient for the Bank to merely establish that NOM transferred monies to the Borrowers rather than pay the debt service.  The parties stipulated that NOM made advances to the Borrowers over the course of the relationship between NOM and the Borrowers.  Although the plaintiff disputes that these 'advances' were loans, the court finds that NOM advanced significant amounts of money to the Borrowers over the course of their dealings.  Thus, the court concludes that any property transferred from the Borrowers to NOM was for valuable consideration of extinguishing an existing debt.  Thus, the plaintiff has failed to demonstrate that it was the victim of constructive fraud.

---

[22] The plaintiff's claim, as set forth in its entirety in the pretrial order is as follows.

(ii)  Fraudulent Conveyance against NOM

NOM fraudulently conveyed the funds at issue in this case to itself with full knowledge of Plaintiff's liens under the Loan Documents, its own subordination to those liens pursuant to the Acknowledgments, and the revocation of Borrowers' ability to collect the Property Proceeds, when it transferred at least $1,584,628 in rents and fees collected from the Properties to itself.  Indeed, NOM freely admits that not paying Plaintiff was the only way that it could recover funds advanced to the Borrowers.

(Doc. #65 at 5).

Furthermore, "every conveyance that frustrates a creditor is not a fraudulent conveyance under the statute." *Aucoin v. Aucoin*, 727 So. 2d 824, 827 (Ala. Civ. App. 1998). The court finds that while the plaintiff is a creditor, and that funds were conveyed from NOM to the Borrowers from which the plaintiff could have realized some portion of its claim against NOM, the plaintiff has failed to demonstrate that NOM intended to defraud the plaintiff. While the actions of the defendants may have been ill-advised and mercenary, they were not fraudulent. Because the plaintiff fails to establish that NOM fraudulently conveyed rents and property proceeds to the Borrowers, the court will enter judgment in favor of the defendants and against the plaintiff on the plaintiff's fraudulent conveyance claim.

### C.  The Bank's Breach of Fiduciary Duty Claim against NOM

The Bank alleges that NOM breached its fiduciary duty "by intentionally and fraudulently diverting monies it collected for the Borrowers and held in trust for the Plaintiff." (Doc. # 65 at 6).  Relying on a single phrase from the Acknowledgments, the Bank asserts that a trust was created when NOM agreed to hold "in trust for the benefit of Borrower[s]," rents collected from the properties.  The Bank's position does not withstand scrutiny.

Under Alabama law, a trust may be created by a trust instrument, a designation, court order or by a "declaration by the owner of property that the owner holds identifiable property as trustee." ALA. CODE § 19-3B-401 (1975).  The Bank argues that the use of the phrase "held in trust" is sufficient as a matter of law to create a trust.  The court disagrees.

31

According to Alabama law, a trust is created *only if*

    (1)  the settlor has capacity to create a trust;
    (2)  the settlor indicates an intention to create the trust;
    (3)  the trust has a definite beneficiary . . .
    (4)  the trustee has duties to perform; and
    (5)  the same person is not the sole trustee and sole beneficiary.

ALA. CODE § 19-3B-402 (1975). Regardless of the use of the phrase "in trust" in the Acknowledgments, the court finds that the plaintiff has failed to demonstrate that, at the time the Acknowledgments were signed, the Bank had an *intention* to create a trust. While the law does not require trust instruments to evince the creation of a trust, without a trust instrument, the plaintiff must establish the existence and terms of a trust by "clear and convincing evidence." ALA. CODE § 19-3B-407 (1975). This it has failed to do. Consequently, because the plaintiff has failed to establish the existence of a trust, the plaintiff cannot demonstrate that the defendants, as trustees, breached a fiduciary duty to the trust. Accordingly, the court concludes that judgment in favor of the defendants, and against the plaintiff, on the plaintiff's breach of fiduciary duties claim.

    *D. NOM's Breach of Contract, or in the alternative, Quantum Meruit Claim against the Bank*.

    In its counterclaim, NOM contends that it "agreed to provide management services and the Borrower and Plaintiff agreed that NOM should be paid for those services." (Doc. # 65 at 18). NOM seeks payment for management services performed for the Borrowers in August and September 2010 prior to the foreclosure sales. The plaintiff admits that NOM

provided services during the transitional period between August 2010 until the properties were foreclosed on in September 2010.[23]  Therefore, the court concludes that NOM is entitled to payment for management services performed in August and September 2010.  At trial, NOM's expert, Jack Wray, testified without objection that, based on his calculations, NOM was owed $20,323.00 for services rendered as the property manager for the Borrowers for the time period in question.  The plaintiff did not challenge Wray's calculations. Consequently, the court concludes that judgment should be entered in favor of NOM on its breach of contract counterclaim, and NOM should be awarded damages in the amount of $20,323.00, plus interest.  *See* ALA CODE § 8-8-8 (1975).

Although NOM argues that it is entitled to recoup $180,000.00 from the Borrowers as unpaid loans, the court concludes that NOM has failed to meet its burden of establishing that it is entitled to recover on this aspect of its breach of contract counterclaim.  In order to recover these funds, NOM is required to establish that the Borrowers breached Section 5 of the Management Agreements.  NOM premises its claim on the theory that because Section 5 permitted NOM to advance money to the Borrower Properties, the section also authorized NOM to repay itself from the rents of the Borrower Properties before paying the Bank. NOM's counterclaim fails for two reasons.  First, the Management Agreements are property specific and only permit NOM to advance funds to a particular Borrower.  The Agreements

---

[23]  The plaintiff took the position that because NOM, in the guise of repaying loans, had paid itself, the Bank should not be required to pay NOM anything else.  Needless to say, the plaintiff's position is not based in law or equity.

33

do not authorize, and the loan documents specifically prohibit, the transfer of funds between the properties. As previously discussed, a plain reading of the loan documents demonstrate that the Bank did not intend or permit NOM to transfer funds from performing properties to shore up non-performing properties.[24]

More importantly, however, the only evidence on which NOM relies to substantiate its damages in this regard are the property specific "to/from" accounting columns in the balance sheets of each Borrower. The "to/from" columns do not indicate from which properties the monies were received and then to which properties the monies were disbursed. Because the balance sheets are specific to each property, there is simply no way for the plaintiff or the court to determine which properties received monies and from which properties the monies originated. Consequently, the court concludes that NOM has failed to meet its burden of establishing damages or demonstrating a breach of the Management Agreements.[25]

---

[24] For the same reasons why the cross-collateralization did not permit the defendants to treat the Borrowers as a single entity, the loan documents did not allow the defendants to advance monies between the Borrowers.

[25] NOM argues that "its course of dealings" with the Bank somehow altered or amended the written documents in this case, and that it would be "inequitable to allow Plaintiff to alter the parties' course of dealing now." In essence, NOM is attempting to rely on a prior course of conduct to alter the clear and unambiguous loan documents negotiated by the parties. This the court will not do, particularly in light of language in the Loan Agreement in which the Borrowers represented that none of the leases, rents or interests therein were assigned or pledged to NOM at the time the documents were signed. (Pl's Tr. Exs. 1, 6, 11 & 16 at Section 5.1(f) at 15).

Moreover, NOM has presented no evidence that would suggest that the Lender was aware of and consented to modifying the documents in the manner favorable to NOM and against its own interests. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kilgore*, 751 So. 2d 8, 11 (1999) ("Conduct of one party to a contract from which the other may reasonably draw an inference of asset to an agreement is effective as acceptance.") In fact, the Mortgage documents specifically refute the defendants' position.

## IV.  Conclusion

Based on the court's findings of fact and conclusions of law, the court concludes that:

1.     Judgment is due to be entered in favor of the plaintiff and against the defendants on its breach of contract claim, and damages awarded to the plaintiff in the amount of $1,063,827.52, plus interest.

2.     Judgment is due to be entered in favor of the defendants and against the plaintiff on the plaintiff's fraudulent conveyance and breach of fiduciary duty claims, and these claims are due to be dismissed with prejudice.

3.     Judgment is due to be entered in favor of NOM and against the plaintiff on NOM's breach of contract counterclaim to the extent that damages are awarded to NOM in the amount of $20,323.00, plus interest.

4.     Judgment is due to be entered in favor of the plaintiff and against NOM on NOM's counterclaims of conversion and intentional interference claims, and these claims are due to be dismissed with prejudice.

The court will enter final judgment after the matter of interest is resolved. Accordingly, it is ORDERED as follows:

---

**Section 7.15     Entire Agreement**  This Mortgage and the other Loan Documents embody the entire agreement and understanding between Mortgagee and Mortgagor and supersede all prior agreements and understandings between such parties relating to the subject matter hereof and thereof.  Accordingly, the Loan Documents may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties.  There are no unwritten oral agreements between the parties.

(Pl's Tr. Exs. 3, 8, 13 & 18 at 14).

1.     The plaintiff's motion for summary judgment (doc. # 51) be and is hereby DENIED as moot.

2.     That on or before October 9, 2012, counsel for the parties are DIRECTED to meet and confer, either in person or telephonically, to attempt to resolve the amount of prejudgment interest owed to the Bank and to NOM.  If an agreement cannot be reached, the parties are DIRECTED to submit briefs containing calculations for interest due under Ala Code § 8-8-8 (1975) on or before October 16, 2012.

Done this 25th day of September, 2012.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE